## New Blue Grass Canning Co. v. Dougan & Hollis.

(Decided January 14, 1913.)

### Appeal from Daviess Circuit Court.

1.   Contracts—Sale of Pumpkins—Refusal of Purchaser to Accept—Subsequent Sale to Purchaser—Estoppel.—Where plaintiffs sold to defendants ten carloads of pumpkins, six of which defendants

received and paid for, and four of which defendants refused to accept and pay for, and plaintiffs then directed their agent at the place of delivery to sell the pumpkins upon the best terms he could get, and the defendants then purchased the pumpkins from such agent at a reduced price, plaintiffs are not estopped by such re-sale to assert a claim for damages growing out of defendants' breach of the original contract.

2.  Contracts—Sale of Pumpkins—Breach—Action for Damages— Instruction.—Where defendants purchase ten carloads of pumpkins and receive and pay for the first six carloads, they are not entitled, on the ground that some of the pumpkins in the first six carloads were not sound and merchantable, to rescind the contract of sale and refuse to accept the remaining four carloads, if, as a matter of fact, the latter are sound and merchantable.

3.  Contracts—Breach—Action for Damages—Sufficiency of Evidence. —In an action for damages for a breach of contract for the purchase of pumpkins, evidence examined and held sufficient to sustain a finding by the jury in favor of plaintiffs.

SWEENEY, ELLIS & SWEENEY, for appellants.

BIRKHEAD & WILSON, and THOMAS DUNCAN, for appellees.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY, COMMISSIONER—Affirming.

Plaintiffs, Albert Dougan and Ott Hollis, partners doing business under the firm name of Dougan & Hollis, brought this action against J. Ed. Guenther and H. L. Kolinsky, partners doing business under the name of New Blue Grass Canning Company, to recover damages for breach of contract for purchase of four carloads of pumpkins. The jury returned a verdict in favor of plaintiffs for the sum of $347.62. Judgment was entered accordingly, and defendants appeal.

The petition is based on a contract by which defendants purchased of plaintiff ten carloads of pumpkins at $3.30 per ton, to be delivered on board cars at Princeton, Indiana, or at Oakland City, Indiana. In addition to the price of $3.30 per ton, the defendants agreed to pay all freight and other charges from the place of shipment to Owensboro, Kentucky, the place of delivery. The pumpkins were consigned to plaintiffs' order, and the bills of lading, with drafts attached for the amount due for each shipment, were to be sent to the National Deposit Bank, of Owensboro, Kentucky, and upon payment of the drafts the bills of lading were to be delivered to the defendants. Plaintiffs shipped six carloads of pumpkins, which were received, accepted and paid for by the defendants. Subsequently they shipped four more

carloads of pumpkins, which the defendants refused to accept. These pumpkins remained in the cars at Owensboro for several days. The plaintiffs then directed their agent at Owensboro to sell the pumpkins, which he did at $2.00 per ton. Judgment was asked for the difference between the contract price and the sale price, together with the expenses of sale. Defendants filed an answer and set-off in three paragraphs. In the first paragraph, they denied that they purchased ten carloads of pumpkins, but claimed that they purchased only 150 tons of pumpkins. They also denied the other allegations of the petition. In the second paragraph they pleaded that they purchased only 150 tons of pumpkins; that on October 20, 1908, and before the shipment of the four carloads of pumpkins, plaintiffs had shipped to defendants 143 tons of pumpkins, which they had received, though some of them were injured or damaged. Prior to the shipment of the four carloads of pumpkins, plaintiffs were notified that under the contract they had no right to ship more pumpkins, and were advised that defendants would not receive more, because they had received within six tons of the maximum amount they had contracted for, and that many of the pumpkins were not merchantable or in any wise fit for use, nor of the size, quality or kind contracted for, nor sound or properly loaded in the cars, according to the contract between the plaintiffs and defendants. On November 9, 1908, plaintiffs entered into a contract with defendants that defendants would purchase said four carloads of pumpkins at $2.00 per ton, and that the price they brought should first be applied to the payment of freight, demurrage and all charges against them, and whatever balance the said carloads of pumpkins might lack of paying the charges should be paid by plaintiffs to defendants. The four carloads of pumpkins were sold to defendants at $2.00 per ton, with the agreement that the purchase price should be applied to the payment of freight, demurrage and other charges against the pumpkins, and that any excess which the defendants might be required to pay should be repaid by plaintiffs. It was further agreed that plaintiffs would honor and pay any draft which the defendants might draw for such excess. By paragraph three, it was pleaded that there were 207,500 pounds of pumpkins in the four carloads, which, at the contract price of $2.00 per ton, amounted to $207.50, and that

defendant paid for freight, car service and other charges the sum of $290.91, leaving a balance due defendants of $83.41. This sum was pleaded as a counterclaim and set-off against the claim of plaintiffs. The allegations of the answer, set-off and counterclaim were denied by reply.

The evidence for plaintiffs fully sustains the allegations of the petition. It appears that on October 10, 1908, defendants directed one Monarch, as their agent, to go to Princeton, Indiana, and buy pumpkins for them. About that date Monarch went to Princeton and concluded the trade with Dougan, of the firm of Dougan & Hollis, for the purchase of ten carloads of pumpkins at $3.30 per ton, delivered on board the cars at Princeton or at Oakland City, Indiana. After Monarch and Dougan made this contract, they went to the livery barn of Henry C. Book, at Princeton, Indiana, where the particulars of the contract were repeated in the presence of the liveryman. Monarch, Dougan and Book all testified to the contract as set out in the petition. It further appears that when the four carloads of pumpkins in dispute reached Owensboro, the defendants refused to accept them. In the meantime, the pumpkins remained on the cars, and the charges for freight and demurrage were accumulating daily. Plaintiffs then directed Mr. Monarch to sell the pumpkins. The sale was made to defendants at the price of $2.00 per ton. The purchase price was to be applied on the car charges, for freight and demurrage. The evidence for plaintiffs further shows that the pumpkins which were shipped to defendants were sound and merchantable, and properly loaded on the cars.

The evidence for defendants is to the effect that they purchased only 150 tons of pumpkins. Among the first six carloads of pumpkins there were some that were not sound and merchantable. Having purchased only 150 tons, they advised plaintiffs about the 21st of October that the pumpkins they had furnished were not up to the contract, and that they had only purchased 150 tons, and directed defendants not to ship any more. Guenther and some of his employees also swear that the pumpkins in the last four cars were not sound and merchantable.

It is first insisted by defendants that plaintiffs are estopped to claim any damages in this action by reason

of the failure of defendants to receive any pay for the
four carloads of pumpkins, because of the contract which
Monarch, as the agent of the plaintiffs, made with the
defendants for the purchase of the pumpkins. An exam-
ination of the record shows that the pumpkins were at
Owensboro, and had been there for several days. The
freight charges had not been paid, and the demurrage
charges were constantly increasing. As the defendants
had refused to accept these pumpkins, it was not only
the legal right of the plaintiffs but their duty to have
the pumpkins sold. They instructed Mr. Monarch to
sell them for the best price he could get. He made the
sale to defendants themselves. By making this contract
plaintiffs were not estopped from asserting a claim for
damages for a violation of the original contract. There
is nothing to show that the new contract of sale was to
take the place of the old. The last contract was made to
avoid any further loss on the pumpkins. The fact that
the sale was made to defendants in no way affected the
duties of the parties so far as the original contract was
concerned. So far as plaintiffs' right to damages is con-
cerned, the result is just the same as if the pumpkins
which were sold by Monarch had been purchased by an
entire stranger.

Complaint is also made of the failure of the trial
court to give the following instruction, which was offered
by defendants:

"If the jury believe from the evidence that the pump-
kins were to be sound, marketable and suitable for can
ning purposes, and shall further find from the evidence
that the first six carloads of pumpkins were not sound
or suitable for canning purposes, then defendant had
the legal right to refuse to accept further shipment of
pumpkins and this without regard as to whether the sale
was of ten carloads of pumpkins or of 150 tons, provided
defendants notified plaintiffs of the damaged and un-
sound condition of the pumpkins already shipped and
that no further shipments of said pumpkins would be
received."

It is argued that this instruction should have been
given because under the evidence introduced by the de-
fendants the defendants had the right to and did rescind
the contract of purchase, and notified plaintiffs before
the shipment of the last four carloads that no more
pumpkins would be accepted. While there are cases

where a non-performance by one party will justify the other party to the contract in rescinding the contract, we conclude that this principle has no application to the facts of this case. The first six carloads of pumpkins were received and paid for. No complaint was made of them until it was sought to prevent plaintiffs from shipping the remaining four carloads. Even then, it was not contended that any substantial portion of the pumpkins contained in the first six carloads were not of the kind and quality contracted for. On the contrary, it is simply claimed that some of these pumpkins were unsound. Certainly the mere fact that some of the pumpkins in the first six cars were unsound would not justify defendants in refusing to receive the last four carloads, if, as a matter of fact, they were of the kind and quality contracted for.

The real issues in this case were: (1) Did defendants purchase ten carloads or 150 tons of pumpkins? (2) Were the pumpkins furnished by plaintiffs sound and merchantable? In addition to these two issues, there was a third issue, bearing on the measure of damages, and that is: Did plaintiffs receive notice of defendants' refusal to accept the four carloads of pumpkins prior to their being loaded and delivered to the railroad company for shipment to Owensboro. These issues were all submitted to the jury by instructions which, though subject to verbal criticism, are substantially correct. Upon each of these issues the evidence preponderates in favor of the plaintiffs. Being satisfied, upon a consideration of the whole case, that the jury reached a fair and just conclusion in the matter, and being unable to find any error in the record prejudicial to the substantial rights of the defendants, it follows that the judgment should be affirmed, and it is so ordered.